Good morning, Your Honors. Carney Shigerian for the Plaintiff Appellant, appealing from a dismissal on summary judgment of Mr. Allen's individual claims and of the class action allegations on the 12b6 motion. I believe the most pertinent part of the record, Your Honor, on summary judgment was the direction of my client to six different reasonable accommodations that Pack Bell could have undertaken, could have given Mr. Allen to keep him in the same job that he had worked for 16 years but didn't consider due to their internal unwritten policy of not accommodating any service technicians with permanent physical restrictions of any type. Roberts. Does the ADA require him to be given the same job? Shigerian. I do not believe it requires that he get the same job it requires, as does the Fair Employment and Housing Act, a reasonable accommodation. There is some case authority in the Ninth Circuit that indicates that the employee should be given preference in the reasonable accommodation process. And I think that the trier fact in general should always look at the employee's preference to determine reasonableness. And it's not something that ever happens at Pacific Bell, as per the defendant's own case manager, Katie Davis, who testified that in the 35 service techs that she had dealt with who had permanent restrictions, none, not one, was ever returned to their original job of a service technician. During the course of Mr. Allen's situation with Pacific Bell, he was given time off to help recuperate from his alcoholism and the treatment that he received for it. But as soon as he was ready to come back to work and he notified him of that fact, there was no question that he was never going to be put back into that job and there was never any consideration. Sotomayor's doctor had said that he had a permanent condition that would limit him to a desk job. Dr. Lim on May 16th indicated that. That indicated, stated, flatly, permanently. Flatly. He indicated two things on that day. To the EVD, he indicated as of July 1st of 2000 he could return to his normal and customary job on May 16th. He said that to the employer?  The only thing he gave the employer was that he was permanently prohibited from doing anything but a desk job. That's what he said. The language is at this time. At this time it's become permanent. What does that mean? It means it may have been not permanent before, but now it's permanent. But the question is, as the months go on and six months lapse from there and Mr. Allen is telling his employer. And they said to him, you can give us any further medical report you have. No, what they said to him was, if you remove your restrictions. In other words, become undisabled, essentially. And that's in sync with Pacific Bell's policy that unless you have no restrictions whatsoever, you're not going back to your job. Well, according to the doctor, he had none six months later. Well, he still did have the climbing restriction, Your Honor. He still did have, as of November of 2000, he still had a climbing restriction. He couldn't climb poles, ladders, or anything like that as of November of 2000. The point is, there might be some distance between climbing restrictions and must have a desk job. But all they're told up to then is that he must have a desk job. By the way, I thought that their policy was that if you did just get a desk job and took a decrease in pay, you got paid at the same level for a year. And during that year, if it turns out you get OK, then you can go back to your other job. Isn't that correct? In other words, yes. In other words, become undisabled. That is correct. But as it turns out, when you have permanent physical restrictions, these people do not become undisabled at any point. And that's the nature of a permanent physical restriction. And that flies in the face of the ADA and FEHA. If we're going to put a lot of weight on permanent physical restriction, then is what Judge Reinhart said was correct. What the employer was told was that he had a permanent physical restriction to a desk job. And it was never given anything to the contrary. Now, you can go on about, well, it wouldn't have made any difference. But the fact is it was never told the contrary. Is that not true? From the doctor, correct. Yes. They said, give me your doctor's certificate. Give me your doctor's certificate. No. What they said as the months went on was if you remove your restrictions, we'll consider you for this job. That's, I believe, Katie Davis' testimony. And bear with me for one moment here. I'm not sure you are. And I believe it's at the excerpt at page 1059. No, pardon me. That's not correct. I believe it's at Excerpt of Record 803-804, Mr. Allen's testimony, where he's reciting his conversations with Ms. Katie Davis. And that particular focus of that, when Mr. Allen's telling them, I can do this job, I have this one restriction, Ms. Davis' response is not, well, let's see what is exactly required in this job. Let me talk to someone in the field. She's like, no, I looked in the book. It says you have to be able to climb, which is not the reality of what service techs do. A lot of them never climb, as Mr. Allen pointed out in summary judgment in the six different scenarios that he suggested he could work in. And Ms. Davis was just wholly uninteractive with regards to determining can this gentleman do the job with some minor modifications. Ms. Davis. Counsel, where in the record were those alternatives presented to the company as possible accommodations? You mean during the? During the interactive process. When were those accommodations requested, the walk-up jobs and the other alternatives that are now being presented? When were they presented to the company? Well, I don't think they were explicitly stated by Mr. Allen, but Mr. Allen told Ms. Davis that a lot of service techs don't need to climb. For example, as we walked up to court this morning, Mr. Allen told me he had worked in this particular building here in Pasadena, and this building has all 0.1s and 1.1s where service techs who work in this building never climb a pole, never climb a ladder. And they could work in buildings like this, and he did work in the Pasadena area endlessly. In the situation where the employee is placed out of work because there's no reasonable modification from the employer, the employer has the burden, according to the Ninth Circuit precedent, I believe in McGregor, themselves to undertake some responsibility in the interactive process to determine is there a modification that we can do at this job that would allow the employee to work. Pack Bell is known for years. In this job? Or, you know, you're saying that the employer has to give him the same job. The employer cannot say, look, I'll give you a different job with my company at the same pay. It has to be reasonable, and the reasonableness is a question of fact for the jury under Bell v. Wells Fargo. Everything's a question of fact for the jury unless the facts don't support that. But reasonableness is. That's what summary judgment's about. All cases are questions of fact for the jury unless they can't make it beyond summary judgment. So I don't know where that gets you. Well, I think a reasonable mind could say that an employer's or employee's preference to return to their regular job when there's six alternatives that are open and Pacific Bell, the employer, knows that these jobs do exist. That's not my question. My question is, you're saying that if X is reasonable, return to my to the present job with accommodations, then the employer can't choose Y instead. That's what you're saying. I think so. Even if Y is also reasonable. Well. In other words, if there are three reasonable possibilities, the one the employer employee wants is the one he gets. Is that your position? No, I don't think so. So let's say there are three reasonable possibilities. Then I think then the employer and the employee, I think it becomes a factual question if you have two reasonable accommodations. But in our particular case here, there was no reasonable alternative because what they were trying to do was put Mr. Allen in a position that they knew he couldn't perform, they knew he couldn't type, they offered him no training to learn how to type. He sought some training himself at the local college up here in Pasadena, and he had no ability to get that training within the time period they're giving him. So in this case before the Court, there was no reasonable alternative given by the employer. Well, the employer did offer him a job. That he can't perform. That he could perform. No, he couldn't. He couldn't type. Yes, he did offer him a job he could perform, and he didn't bother responding. That was the same job they had tested him for twice before. I'm not talking about the one they tested him for. I'm talking about the one that was nominally at a lower level, but he would get his same pay for a year. That's the one I'm talking about. That's correct. And then he didn't choose to respond, or he didn't respond at least. He already had a lawyer by then, maybe that's why he didn't, but that's neither here nor there. He didn't respond to that job offer, correct? That's incorrect. It's the same job they tested him for the first two times. It was no different. I'm sorry, that's not what the record shows. The record shows he refused jobs by not picking them up twice. One time it was a job that didn't require testing. He was absolutely able to do that. I think that's the one where he received two calls, and then he said he didn't know who to call back, that he didn't recognize the name or something like that. But there was, Judge Fernandez is talking about it, not the one where he didn't go to the test, but the earlier time where they called him twice about the job, and he never returned the call. That's the job he's talking about. That became a rejection by him automatically of that job. But it didn't kick him out of the system because that was his lower job, and you had to have two rejections of lower jobs you had to kick out of the system. It didn't kick him out of the system. But, indeed, there was such a job. Oh, that's correct, Your Honor. All right. What's wrong with that? Well, first of all, there was never any explicit offer for that job from this unknown person that my client had not been speaking to, and that's not a job that my client was familiar with at that point in time. What does it matter? He has to be familiar with it, too? Even if it's reasonable, he has to be familiar? Well, I think there has to be some showing, at least on summary judgment, that he was qualified to perform that job, which there never was, that there was an explicit offer made, some kind of formal offer made, that he was going to be given that job, and that was not shown on summary judgment. And it wasn't a situation that my client experienced. What do we do with the fact that around the same time period, he's telling Social Security that he can't climb, he can't crawl, he can't walk more than a half a block, et cetera, et cetera, and therefore can't do any job in the world? And he's too tired and too dizzy to work also. What do we do with that? Well, when he's telling Social Security that he is disabled and completely disabled, he's letting them know from his regular profession, what he's been doing for 16 years at that point in time, that he cannot do that job without some modification to the job. He's much more specific than that. He says, I can't walk over a half mile, I can't walk more than three minutes to five minutes without resting, I can't crawl, I can't climb, I'm too tired and I'm too dizzy to work. That's what he tells them specifically. I can't crawl, I can't bend, I can't lift. He tells them, what do we do with that? He's telling Social Security that, and he wins, by golly. He gets Social Security disability benefits. Correct. And he lets Social Security know that he's continuing to do service tech work on his own and he's continuing to do an outside job of security work in Pasadena at that time. And he's kept them appraised of that fact through the present day, that he has been doing service tech work with his pulse. That's my point. He said he couldn't lift, he couldn't crawl, he couldn't bend. He couldn't climb, he couldn't walk, and he was too tired and too dizzy to work. That's what he's telling them. And that's the reality. And given those restrictions, he could do this other job, you would say. Well, he was doing it. No, no, no. The job for Pac Bell. Well, that's right. What I'm telling the Court is that he did a service tech job very shortly after going on partial disability benefits. He was doing service tech work and continues to do it through now and security work. It's not that much work he's doing because he's doing it on his own as far as the service technician work, but he's capable of doing that work. Capable of doing it on a full workday. No, he doesn't do it on the full. I mean, he doesn't have that much work to do it on the full workday. So that would be another accommodation? I mean, the accommodation would be he doesn't have to work full time? No. When he was still employed by Pacific Bell through November of 2000, any of the accommodations that we have suggested and we suggested on summary judgment were available to him. With his restriction at that point in time of getting tired from climbing and potentially getting busy, which was their main concern, the main concern of Dr. Lim, any of the alternatives we suggested, using a bucket truck whenever he needed to go on top of a pole or work somewhere at a distance, having work limited to 0.1s and 1.1s work where you never climb anywhere. But, Council, those alternatives were not given at the time the interactive process was in process. I believe what he did, he told them one suggestion was that he could work as a walking tech, where you're assigned to one building, like in downtown L.A., where the buildings are relatively large or Century City or Beverly Hills or Pasadena, where one service tech from Pacific Bell is assigned to that building and all they deal with are walk-up terminals. I'm sorry, Your Honor, but I don't know off the top of my head where it is in the record. I believe that was in his testimony. I believe it was also in Katie Davis's notes, but where it is exactly in the large record, I don't have it outlined here in front of myself. I believe that was the one alternative that he did speak up about, but I think the Ninth the employee, from his vantage point then, he's worked here 25 years, he's seen what goes on. Sure, does he know at that particular time that they are walking techs, that they're MPOing, that there's 0.1 work, or that the company can make that accommodation? I don't think so. It's his burden to determine at that point in time. Pacific Bell, by their admissions through their numerous managers, from Kevin Quinn to Ron DiDemisio, just doesn't accommodate these workers in that position. And that flies in the face of the interactive process, when you have a company that 100 percent, across the board, never allows a disabled person to stay in that job. From my perception, that's a violation of the fee on his face, and I think this Court in McGregor said that is a per se violation of the ADA as well. Unless there are any other questions, I would like to reserve my time for reply. Thank you. Thank you, counsel. May it please the Court, George Prionas on behalf of Pacific Bell, to address, first of all, the question of whether or not Mr. Allen was offered a job. There were two job searches. The first job search was unsuccessful because there was a temporary hold on job vacancies at the time. Pac Bell's system has some 45,000 employees, and they have an elaborate system of tracking vacancies. There was an unusual period, so a second job search was conducted. The second job search, within a matter of less than a week, offered Mr. Allen the job of maintenance administrator, for which he was automatically qualified. The job of a maintenance administrator is one who sits at a desk and receives service calls from customers. Many of those service calls can be repaired through the computer and so forth. It's the same job, essentially, as the outdoor job of going to the homes, climbing the poles, and fixing the wires that are broken, but it's something that can be done from an office, from a desk. It's when you call up the telephone company and say, I've just moved into this new apartment. I need you to start service. All they've got to do is push a button, and service commences. So that's what the maintenance administrator's job is. He was imminently qualified for it after 20-some years of working through that system. He simply ignored the telephone calls offering him that job. The other point I want to address is that that wasn't he had a right to do that, didn't he? I mean, that didn't automatically end it. No. No, he did not. No one forced him to take the job, but he was offered, and he declined it. And that was. And under your procedure, you then go on to the next job, right? Correct. Correct. And what's interesting is a little difference between his rights under the collective bargaining agreement and so forth. When someone gets injured or is ill and gets a doctor's note saying that I can't work or I have restrictions, that triggers an awful lot of issues for an employer. It triggers rights under the collective bargaining agreement. It triggers rights for short-term disability, for long-term disability, rights under the family medical leave, rights under the ADA, rights under workers' comp, and so forth. And there's only one way an employer can work through that morass, and that is to rely on the qualified medical opinions of the treating doctor and of any third-party doctor that's been done, that's involved. There's no way that Katie Davis, who is a relatively clerical employee and making some of these determinations, or supervisors or anyone else is going to make those medical determinations. You have to be able to rely on the opinions of the doctor. What we have here is a situation where a plaintiff is now saying that I sort of had my fingers crossed and everything the doctor told you back in May and June and July. Things do change. I mean, he did say at the time, despite that he was able to, that he had improved and he was able to. Absolutely. Did Katie Davis ever say to him, you have to get another statement from the doctor? Yes. Okay. Do you know where that is? That's in her testimony from her deposition. And I think she's also got an affidavit or declaration to the same effect. I don't have the site on the record, but I can provide that if you'd like. I thought that was the case, but your opposing counsel said no, he had not been told. He misspoke on that. All right. We'll find it in the record. The system that has been negotiated between Pacific Bell and Communication Workers of America is an elaborate system for determining when people have the right to move into vacant positions. Under that system, they have what's called automatic upgrade and transfer system. Any employee can register his interest in transferring to any job. And they're put, and there's an elaborate seniority effort to do that. You can switch jobs. You can transfer from location to location and so forth. When someone is injured and becomes a qualified injured person or disabled person, as was Mr. or medically restricted person, as was Mr. Allen, he got super seniority. He got first consideration for any opening that came up. Is there any program to assist people who may be able to qualify for a substitute job with a minimal amount of training? Yes. He wasn't. He was offered substitute jobs. And I'm thinking of the job where it would require him to be familiar with a computer or whatever it was where he would have needed a little bit of training for it. Yeah. The record is silent on that to the extent to which that training is offered. He said he asked for it and he couldn't get it at the company. Yes. He said that was his testimony is that he asked for it. That was not Katie Davis's testimony. But on summary judgment, that's fine. And but there is no obligation to train people for the substitute job under the collective bargaining agreement. He already has the super seniority. No, I'm not talking about the collective bargaining agreement. I wanted first. My question was, if people are disabled and they've done one job for 26 years, it may be that in order to do another job, they need a minimal amount of training to learn how to do the other job. And I wondered whether that was generally available. I do not. The record does not indicate that there was any training available on this particular word word processing test that he was asked to take for the second job that was offered. It was a basic keyboarding test. And the record did not, does not indicate whether that, whether there was particular training offered for that. He was, but. I take it if he had bothered to come and take the test, which he said he would plunk anyway, the search would have gone on. Correct. The search would have continued had he come and taken the test. That's for certain. And had he accepted the maintenance administrator job earlier, he would have had. And if any time his health improved to where he could, the doctors would have cleared him to go back to his normal job, he would have been entitled automatically to move back to his normal job. People do do get better from time to time. And it's a little unclear to me what the plainest argument is on that, whether they're saying that he got better. There's a point in the in the brief where they say up until July he was disabled and suddenly he got better in July. But there was no indication after July of any information from the doctors that was any different that that he that his condition had improved. And he was. Opposing counsel's position that the company simply does not accommodate in the service tech position. Well, I think we just need to look at the record as to what it did with Mr. Allen. It did. It did accommodate him. It made lots of efforts to. No, I think they mean that. I think what they're saying is and I think is accommodate him to be able to do so that he would be able to do the service tech job. Well, he really isn't asking for an accommodation to do the service tech job. He's asking for a different job. His job. The job he had before he was hospitalized for a month was go out to people's homes, climb down into underground vaults on a ladder. Well, there must be. Isn't there a service tech classification? Isn't that a job? That's a single job classification. Single job classification. And Judge Rawlinson's question is what is your answer to your opponent's statement that in that job classification, you may put somebody who becomes disabled into another job, a different job, but you never will make an accommodation that would allow someone to continue to do a service tech job. That, I think, is the question. Well, the service tech job includes all the functions. And I think what the question implies is that is Pacific Bell obligated to remove what it considers to be essential functions of the job from that? My question was opposing counsel said that Ms. Davis in her deposition stated that there had never been an occasion where someone was accommodated. Oh, I see. Okay. Oh, this is very, very. To perform a service tech job. And my question is what is your response to that? There's a very simple and straightforward answer to that. The way the system is organized, before Ms. Davis gets a file on anybody, there's already been a determination made by the doctors and made by the nurse. In this case, it was Dr. Lim, the treating physician, Dr. Greenberger, the third-party physician, Lisa Perla, a registered nurse. The three of them concluded that he could not perform that job. So that's true for all of the disabled service techs. A determination has been made that he or she could not perform that job in all instances. Before there is a job search, there's a determination by others that he cannot do that particular job. So is your answer that in each of those instances, a determination had already been made medically? Correct. That those individuals could not perform the service tech job? Correct. And her function was to assist in finding an alternate position. There may have been. Let's look at it a little different way. Let's say the determination is made in all instances that the person cannot perform that job because the person cannot climb poles. Okay? Okay. Let's say, if I understand what their argument really is, is that climbing poles is not an essential function of that job, even if you have it listed as a function of the job, it's not essential. Ergo, if you refuse to accommodate by letting people have that job without climbing poles, and that's your blanket rule, that's a violation of the ADA. That's their argument, I think. Okay. So how do you answer that? That's a different question, a little different from what Ted Ross has, but it's coming at it from, I think, the ADA angle. The first answer is that it's clear from the record that climbing poles, climbing ladders, lifting manhole covers, walking, standing, all the things that he was disqualified by the doctors on his desk job only are essential functions of the job. Even the concept of walking tech, which he says is a job, which doesn't appear anywhere in the collective bargaining agreement or anywhere in the history of the company that there is such an identifiable job. In any event, even that job requires you to be on your feet all day, and the medical evidence that the company had was that he can only do a sitting job. Well, I understand that. The question is a little different. It's more of a theoretical question. I see. Okay. All right? I understand that you can say, look, we might be terrible people. I'm not saying you're saying that. We might be terrible people. We may never accommodate. But that makes no difference to him because he couldn't do it no matter what. No. So he's an individual case, I understand. But the argument I think I hear him making is, well, in fact, he knew he could do everything except climb poles. And he also knew that with that one exception, they would refuse any accommodation. What he inferred or thinks he knew may be very different from what certainly isn't the case. Let's pretend that's true. But the climbing of the poles was, A, a part of his job. Yes. Okay. And an essential part of the job. You cannot repair a service to a customer if the terminal is up on a pole and you can't access the pole. Oh, sure. You have to come back. But does every service tech have to be able to climb poles? Aside from your definition that says, yes, by definition, yes. Not every time a service person goes out do they have to climb a pole. Sometimes the customer might just have gotten it unplugged from the wall and that's all they have to do. But so, yes, it's not every occasion that you have to be able to do that. But what you're suggesting and what the plaintiffs are suggesting is that we have to create and design a new job for him, which is not what the ADA requires. We don't have to create a new and different job. Sure. Yeah. He says, look, I know and you know, says he, I and Pat Bell both know that there are lots of service tech jobs where the people never have to climb poles. I mean, never. They're not being sent out at random. They just never have to climb a pole. And that's the kind of job they could have accommodated me into. That's what he says. Answer? The answer is he doesn't get to pick and choose which accommodation and which job he wants. If we offer a reasonable alternative position, which we've done, and which the entire system is designed to do, and it's a negotiated system with the union, then he doesn't get to pick and choose and design. That's number one. Number two. What is the reasonable alternative? What is a reasonable alternative accommodation he was offered? I understand the one that he didn't respond to, which was at a lower level. Correct. He didn't respond to the other one either. I know that. I understand. Is it a reasonable accommodation to offer somebody a job which he is incapable of performing? Because he's too stupid to learn a keyboard. I'm not saying he is, but let's say he is. First of all, he was never offered a job that he was incapable of performing. And I don't know that any employer would. I don't know why you would offer a job you know someone can't perform. Well, he says, look, they had tested me on this dumb keyboard two times before, and I flunked both times. And obviously I was going to flunk the third time. The terminology is maybe confusing. He was matched to a job. In other words, he was informed that there was a vacancy and that he had to qualify for it. If he qualified for it, the company would have deemed him qualified and capable of performing that job. Let's say the company knows he can't qualify for that job. Well, then it would have been as if he had never been offered it. Correct. That's where we're at. It would have been as if he was never offered. And then they would have gone down the road and kept looking. So your point really is that in terms of accommodating, never mind that particular job, all he had to do was go through the motions. Correct. And we have gone on looking for an appropriate job. Absolutely. Absolutely. What's the point if they offer you a job that requires you to know how to use one of these keyboards, whatever you do with it? I'm one of those people who's too stupid to know how to use one of those things. I couldn't do it either. Now, I go and I take it and I can't front the test. And it's not something I'm capable of doing. Now, I might be if you take a couple of days and give me some training. I doubt it. I probably still wouldn't learn how to do it. But if you know, I don't know how to do it. I mean, what is he? Is he supposed to come take this test five times, 10 times? Well, first of all, we were in your case. We probably put you back on the pole. Right. That would be even a bigger mistake. But the terminology, again, he was never offered the job that required the keyboarding test. He was offered the opportunity to take the test to see if he qualified. That's two different things. And he took it twice and he didn't. It's perfectly logical to say, hey, here's an opening. Let's see if you can do it. OK, that's fine. And he took it twice. There's nothing evil about that at all. No, no, that's fine. But he does it twice and he can't do it. Well, then the third time, does he have to keep going down and taking the test or he gets fired? He didn't do it twice. First of all, the fact is, ask anybody who's got a driver's license. The fact that you have to take it twice to get the license doesn't mean you flunk it twice. Doesn't mean you won't pass it the last time. But the if you know how to drive, asking us, asking the company to infer that this man was who is a skilled technician. I mean, would be incapable of passing the test. And I think that's unfair to him. I mean, there's no way that in the way the system operates that you would say, well, we're not even going to let him take the test. I mean, there's no skin off anybody's nose if he doesn't pass it. I think there's a question that the service tech position does not have to be altered in a way to accommodate a disability. No, no, no. I said that you don't have to eliminate essential job functions from the job and you don't have to create a new job. But if you are, in response to a question, you said that there may be some jobs where the people don't have to climb and everything, but you don't have to offer that job to this plaintiff. Well, absolutely. And the reason for that is answered, I think, in one of this court's present decisions, and that's Willis v. Pacific Maritime Association. If you look at that case, the longshoremen had a system of having a handful. I think it was about 30 light-duty jobs. They also had a system of transferring injured workers or whatever into a marine clerk's local and a marine clerk's job, all covered by the collective bargaining agreement. And there was a procedure for doing that. And Mr. Willis and the other plaintiff in that case attempted to transfer. They didn't have enough seniority to do it because there wasn't a vacancy. In this particular situation, there's no evidence that there was any vacancy, number one. And the way the work assignment and bidding procedure works under the collective bargaining agreement is you can switch classifications, you can switch garages. And so forth. Are you saying in this case there is a job available light-duty for service tech? No. No. You know, if there happens, the way the system is organized is employees are assigned to particular garages. And they have the right to transfer from garage to garage. That's one right they have under the collective bargaining agreement. They cannot, however, pick and choose which truck they get, which route they get, and so forth. That wasn't the point. The point is if there is a job that's available for disabled individuals, I thought your position was that did not have to be offered. Is there a job in Pac-Bell that's a light-duty job for service techs who cannot perform? First of all, yeah. There is no such job in the first instance. And second of all, in terms of offering jobs, if it's, if there's. If there's no job, what do we need to, what would happen if there were? And there was no job, and there is no job, for example, that would have been in compliance with what the doctor said in terms of the desk job only, because even these so-called light-duty jobs don't, aren't desk jobs. They involve considerable effort. All right. Thank you, counsel. Thank you. If I could address just three brief points in response to one of the Court's questions with regards to Katie Davis's admission that of the 35 service techs she worked with, no one was ever given any type of service tech job again. It wasn't just her admission that we relied upon on summary judgment. Also, the garage manager where Mr. Allen had worked, Kevin Quinn, testified that there was an across-the-board policy, bar none, that service techs with permanent physical restrictions never work in the field again. There also was an admission from a lower-level manager, Rick Kennedy, to another service tech who had a permanent back condition, that he would never work in the field again. And finally, there was testimony from a Ron DiDemisio, also a garage manager in Pasadena, who said that we don't give any work to permanently restricted service technicians. And that has been the policy of PACBEL, and there was never any denial on the record, in the record anywhere, that this was, in fact, their policy. Job restructuring is an essential part of the ADA and Fair Employment and Housing Act from the plaintiff's perception. Job restructuring is required by Pacific BEL's own internal policy. Exit the record 858 to 859, they say that before they will attempt a job search in another position, they will first have to deem it not possible to put them back in their original position. And that's their own language, not possible, which leads into, I believe, not only the company's own degradation of the Fair Employment and Housing Act and ADA, but also their own internal policies, which I think creates at least an issue of fact and inference that what they were doing was not reasonable by not following their own policies, essentially. Thank you, Your Honor. That reads to me. Thank you, counsel. The case just argued will be submitted. The Court will take a brief recess.
judges: Reinhardt, Fernandez, Rawlinson